**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

STEPHANIE HABBEN,

        Plaintiff,

vs.

CITY OF FORT DODGE; FORT
DODGE HOUSING AGENCY;
CAROLYN OLSON, Individually and in
her official position as Executive
Director of the Fort Dodge Housing
Agency; and ROCHELLE NOLTE,
Individually and in her official capacity
as Section 8 Housing Manager of the
Fort Dodge Housing Agency,

        Defendants.

No. C 05-3076-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING MOTIONS
FOR SUMMARY JUDGMENT BY
THE CITY AND THE HOUSING
AGENCY DEFENDANTS**

---

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        *1.    Facts deemed admitted by operation of local rules* . . . . . . . . . 3
        *2.    Essential facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *A. Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *B. The Housing Agency Defendants' Motion For Summary Judgment* . . . 17
        *1.    Individual liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            *a.    Arguments of the parties* . . . . . . . . . . . . . . . . . . . 17
            *b.    Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        *2.    Sufficiency of Habben's claims* . . . . . . . . . . . . . . . . . . . . 21

        *a.*       *Race discrimination* . . . . . . . . . . . . . . . . . . . . . . . 21
           *i.*     *Arguments of the parties* . . . . . . . . . . . . . . . . 21
           *ii.*    *Habben's "direct" evidence* . . . . . . . . . . . . . 26
           *iii.*   *Habben's "circumstantial" evidence* . . . . . . . . 27
        *b.*       *Sex discrimination* . . . . . . . . . . . . . . . . . . . . . . . 36
           *i.*     *Arguments of the parties* . . . . . . . . . . . . . . . . 37
           *ii.*    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    *C.  The City's Motion For Summary Judgment* . . . . . . . . . . . . . . . . . . 42

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

The plaintiff in this case asserts that she was terminated from her job with a municipal housing agency in violation of state and federal prohibitions on race and sex discrimination after she gave birth to her third biracial child. In a motion for summary judgment, the defendant city asserts that it is not a proper defendant on any of the plaintiff's claims, and in a separate motion for summary judgment, the housing agency defendants—the housing agency itself and certain of its officials—assert that all of the plaintiff's claims fail as a matter of law.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendants' motions for summary judgment. The court will then discuss specific factual

disputes in the context of pertinent portions of its legal analysis. Before providing even a summary of the factual context for the plaintiff's claims, however, the court must address some of the problems that the court has encountered with determining what facts are actually in dispute in this litigation.

### 1. Facts deemed admitted by operation of local rules

The court's ability to determine precisely what facts the parties accept as undisputed and which they contend are genuinely disputed has been considerably hampered by the plaintiff's failure to file a response to either of the statements of facts submitted by the moving defendants as required by the local rule governing summary judgment motions. Local rule 56.1(b) provides, in pertinent part, as follows:

> **b.** **Resisting Party's Documents**. A party resisting a motion for summary judgment must, within 21 days after service of the motion, file contemporaneously all of the following:
>
> * * *
>
> **2.** A response to the [moving party's] statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact, filed as an electronic attachment to the brief under the same docket entry;
>
> **3.** A statement of additional material facts that the resisting party contends preclude summary judgment, filed as an electronic attachment to the brief under the same docket entry[.]

N.D. Iᴀ. L.R. 56.1(b)(2). The plaintiff failed to comply with this rule.

Specifically, instead of filing *both* the required response to each moving defendant's statement of material facts pursuant to N.D. Iᴀ. L.R. 56.1(b)(2) *and* a statement of additional facts pursuant to N.D. Iᴀ. L.R. 56.1(b)(3), the plaintiff filed *only* a "Statement Of Contested Material Facts" in response to each motion for summary judgment.

Moreover, even though the plaintiff's statements of "contested" facts track the defendants' statements of facts paragraph-by-paragraph, the plaintiff often fails to "expressly admit[], den[y], or qualif[y] each of the moving party's numbered statements of fact" in her corresponding paragraphs, as required by N.D. Ia. L.R. 56.1(b)(2). Instead, some of the numbered paragraphs of the plaintiff's statements of "contested" facts, which are apparently meant to correspond to the numbered paragraphs of the defendants' statements of facts, assert additional facts with no clear indication of how they qualify, or even relate to, the facts stated by the moving parties.[1] Other paragraphs of the plaintiff's response consist of or include objections to "implications" of or "inferences" from facts stated by the defendants, again without clearly admitting, denying, or qualifying the facts actually stated by the defendants.[2] Thus, such paragraphs of the plaintiff's statements of

---

[1] For example, in paragraph 2 of the Housing Agency Defendants' Statement Of Material Facts (docket no. 10), those defendants assert, "At all times material hereto Carolyn Olson was the Executive Director of the Fort Dodge Housing Agency," to which the plaintiff responds, in the correspondingly numbered paragraph of her Statement Of Contested Material Facts Re: Housing Agency Defendants (docket no. 19), "Plaintiff was hired by the prior Executive Director, Rayme Nuckles."

[2] For example, in paragraph 5 of the Housing Agency Defendants' Statement Of Material Facts (docket no. 10), those defendants assert the following:

> Plaintiff is Caucasian. She is the single mother of 3 biracial children. When she was hired by [Fort Dodge] Housing [Agency] she was a single mother of 2 biracial children.

Housing Agency Defendants' Statement Of Material Facts (docket no. 10), ¶ 5 (citations to record omitted). In the correspondingly numbered paragraph of her Statement Of Contested Material Facts Re: Housing Agency Defendants (docket no. 19), ¶ 6, the plaintiff "denies the implication that Carolyn Olson played any role in Plaintiff being hired for a position at Fort Dodge Housing Agency." Even if it were proper for the plaintiff to object to "implications," the defendants' statement cannot give rise to the "implication" that the plaintiff finds objectionable, because the defendants' statement does not address

(continued...)

"contested" facts are not properly responsive to the corresponding paragraphs of the defendants' statements of fact.

The local rule applicable to summary judgment motions also defines the consequences of failing to provide proper responses to a moving party's statement of facts, as follows:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. *The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.*

N.D. IA. L.R. 56.1(b) (unnumbered paragraph) (emphasis added). Here, because the plaintiff failed to make a proper response to several of the defendants' statements of facts as required by N.D. IA. L.R. 56.1(b)(2), the court could treat as admitted any fact statements to which no proper response has been filed. The court has done just that quite

---

[2](…continued)
the plaintiff's hiring at all.

Similarly, the Housing Agency Defendants state, "In 2004, while still employed by [Fort Dodge] Housing [Agency], Plaintiff gave birth to her third child," *see* Housing Agency Defendants' Statement Of Material Facts (docket no. 10), ¶ 6 (citations to record omitted), to which the plaintiff responds, in part, that she "disputes any inference that her giving birth to a bi-racial child was not the reason that the Fort Dodge Housing Agency [Defendants] made the decision to terminate Plaintiff's employment." Plaintiff's Statement Of Contested Material Facts Re: Housing Agency Defendants (docket no. 19), ¶ 6. Again, even if it were proper for the plaintiff to object to "inferences," the defendant's statement has nothing to do with whether or not the plaintiff's giving birth to a third biracial child was or was not the reason that the Agency terminated her.

recently in another case in which a responding party failed to comply with N.D. IA. L.R. 56.1(b)(2). *See Saeemodarae v. Mercy Health Serves—Iowa Corp.*, 456 F. Supp. 2d 1021, 1025-26 (N.D. Iowa 2006). In that case, however, the court deemed admitted all facts set forth in a statement of facts to which no proper response had been filed only after the court had expressly advised the parties that compliance with N.D. IA. L.R. 56.1 was required for their submissions in support of or resistance to a motion for summary judgment filed after the court had "converted" a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure into a motion for summary judgment. *Id.* The court does not believe that such an express reminder to comply with the applicable local rules should be required in all cases, because N.D. IA. L.R. 56.1 itself provides sufficient notice of the manner in which the parties are to file and respond to a motion for summary judgment as well as the consequences for failing to do so. Nevertheless, under the circumstances presented here, in order to give the plaintiff all reasonable inferences from the facts in the record, as the court must do on motions for summary judgment, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the court will only deem admitted facts set forth in the defendants' statements of facts to which the court can find no plainly contrary statement in the plaintiff's statements of "contested" facts.[3]

---

[3]This course appears to be acceptable to the Housing Agency Defendants, despite their argument in their Reply To Plaintiff's Statement Of Contested Facts that the plaintiff has failed to comply with N.D. IA. L.R. 56.1, because they state in their Reply that "[t]o the extent that Plaintiff has failed to either admit or deny a statement of material fact as required by [the] Rule, Defendants will treat Plaintiff's statements as qualifications to the Defendants' statement of material facts and respond accordingly."

## 2.    *Essential facts*

Notwithstanding the confusion arising from failure to comply with the applicable local rule concerning the parties' statements of facts, it appears that the parties agree that plaintiff Stephanie Habben was hired on December 6, 2000, as a Section 8 Housing Assistant with the Fort Dodge Housing Agency (the Agency) by then-Executive Director Rayme Nuckles. Habben's direct supervisor throughout her employment with the Agency was defendant Rochelle Nolte, the Section 8 Housing Manager. At some point during Habben's employment, defendant Carolyn Olson became the Executive Director of the Agency and, thus, Nolte's supervisor.

The Agency was created by a resolution of the City of Fort Dodge (the City) on February 16, 1971, that authorized the Agency to exercise all of the powers allowed by IOWA CODE CH. 403A, which, in turn, authorizes municipalities to operate housing projects. The City also appoints the members of the Board of Commissioners of the Agency, but the City contends that it has no operational or budgetary control over the Agency, does not provide any municipal funds to the Agency, does not own or lease the land on which the Agency has its offices, has no role in hiring of any employees of the Agency, and does not employ any of the Agency's employees. Habben contends, however, that the Director of the Agency regularly attends weekly City staff meetings with other managers of City departments and that the Mayor has directed activities of the Agency to the extent of contacting Agency employees with concerns about housing inspections and mistakes in the calculation of rents for tenants in the Section 8 program. The City contends that nothing in the portions of the record cited by Habben supports her contentions about the City's purported control of the Agency, even if those facts were sufficient to establish that the Agency is somehow a department of the City or under the City's control.

Notwithstanding that the Agency was created by a resolution of the City to conduct activities authorized by an Iowa statute, it is undisputed that the Section 8 Housing Program administered by the Agency is funded in its entirety by the United States Department of Housing and Urban Development (HUD). Thus, HUD provides all of the funding for the Section 8 Housing Department of the Agency, including staff salaries and operational budgets, and funding for each of the departments of the Agency is restricted to use within that department.

During her employment with the Agency, Habben's duties involved, among other things, managing rent changes and re-certifications of eligibility, taking calls from tenants and landlords, preparing new leases, and briefing new applicants for Section 8 housing. During the course of her employment, Habben was also trained as a housing inspector and did perform housing inspections for a period of time, but she asked to be relieved of that duty. The Agency complied with her request and subsequently employed a full-time housing inspector. Habben eventually was designated as a Housing Specialist. In May 2004, Habben received a favorable performance review and the maximum available merit raise in pay. Nevertheless, the Agency contends that there were some persistent problems with Habben's performance, including errors in her work, and a tendency to play video games on her computer when she didn't have anything to do instead of helping other overworked members of the Section 8 Housing Department. Habben contends that these complaints are plainly contrary to statements in her May 2004 performance review.

At the time Habben was hired by the Agency in 2000, she was already the single mother of two biracial children, and both Olson and Nolte knew that fact. Habben agrees that Nolte had been cooperative about adjusting Habben's work schedule to accommodate times when Habben had to take her children to school or to doctor's appointments. Habben asserts that things changed, however, and in particular, that communication with

Nolte about changes in how Habben was to perform her job deteriorated dramatically, when Habben told Nolte that she was pregnant with her third biracial child in the spring of 2004.

In August 2004, Habben gave birth to her third biracial child. Habben took six weeks of accumulated paid leave for maternity leave, including time before and after her delivery. During her absence, her duties were performed by other members of the Section 8 Housing Department, but primarily by Sauscha Grady, who ordinarily worked as a receptionist. Grady is Hispanic and is also the mother of a biracial child. While Habben was in the hospital after her delivery, she received flowers from the Agency. In addition, either shortly before or shortly after Habben returned to work, the staff at the Agency had a baby shower combined with a staff meeting at which Habben showed off her new baby to the staff, including Olson and Nolte, and at least some members of the staff gave Habben baby presents.

Habben returned to work after maternity leave on September 13, 2004. She contends that, shortly after she returned to work, she had a meeting with Olson and Nolte during which she was told about various concerns that arose while she was on maternity leave. Habben contends that she did not understand the purpose of the meeting, because some of the topics discussed had nothing to do with her job. Habben also felt that she was being blamed for the "mess" that had developed in her absence as a result of inadequate coverage of her duties.

Habben was terminated, on November 3, 2004. The Housing Agency Defendants assert that Habben was terminated as one of several responses of the Agency to funding cuts imposed by HUD in June 2004 that were made retroactive to January 2004. According to the Housing Agency Defendants, Olson and Nolte decided to cut Habben's position, because terminating her position would result in the greatest amount of savings

to the Section 8 Department, her duties were easily reassigned to others within the Agency without requiring additional staff training or the need to hire a replacement, and because there were some continuing problems with Habben's performance. Habben, however, contends that she was harassed, "set up" for termination, and ultimately terminated on the basis of race and sex or pregnancy because she was pregnant with and eventually had a biracial child.

After Habben was terminated, many of her duties were assumed by Angie Wedemeyer, an existing Agency employee, who also continued to perform her job as the Administrative Services Assistant for the Agency. Other existing employees of the Section 8 Department were also assigned some of Habben's former duties. Habben contends that Wedemeyer was given a "new" position in the Section 8 Housing Department and that another full-time employee was eventually added to the staff of the Section 8 Department after the supposed reduction in force (RIF) in which she was terminated. The Agency contends that employees were only reassigned to cover Habben's former duties, with the result that one full-time position, Habben's, was eliminated from the Section 8 Department. The Agency also contends that the supposed "additional" full-time employee later hired was actually funded by a separate funding stream from HUD when the Fort Dodge Housing Agency took over responsibility for Section 8 housing in Ames, Iowa, as well as Fort Dodge.

### B. Procedural Background

After her termination, Habben filed an administrative complaint of discrimination with the Iowa Civil Rights Commission, and the administrative complaint was then cross-filed with the United States Equal Employment Opportunity Commission. Habben concedes—by failing to deny directly—that she did not name the City as a respondent in

her administrative complaints, but she contends that she filed the administrative complaint without the assistance of counsel and that the Agency was accountable to and operated in connection with the City, apparently suggesting that the City had adequate notice of claims against it.

After obtaining notice from the administrative agencies of her right to sue, Habben filed her Complaint (docket no. 1) in this action on December 1, 2005. Habben named as defendants the City; the Agency; Carolyn Olson, individually and in her official capacity as the Executive Director of the Agency; and Rochelle Nolte, individually and in her official capacity as the Section 8 Housing Manager for the Agency. As her First Cause of Action, Habben alleges that she was discriminated against, harassed, and discharged from her employment with the Agency because of her race and race related activity in violation of 42 U.S.C. § 1981. As her Second Cause of Action, Habben alleges that she was discriminated against, harassed, and discharged because of her race and race related activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. As her Third Cause of Action, Habben alleges that she was discriminated against, harassed, and discharged because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Finally, as her Fourth Cause of Action, Habben alleges that she was discriminated against, harassed, and discharged because of her race, race related activity, and sex, in violation of the Iowa Civil Rights Act (ICRA), IOWA CODE CH. 216. She prays for declaratory relief, back pay and other actual or compensatory damages, front pay and other future compensatory damages, punitive damages, costs and attorney fees, and such other relief as is appropriate.

The Agency, Carolyn Olson, and Rochelle Nolte (collectively the Housing Agency Defendants) filed a joint Answer (docket no. 4) on January 25, 2006, and the City filed a

separate Answer (docket no. 6) on February 3, 2006. In their Answers, the defendants deny all of Habben's claims, demand a jury trial, and assert various affirmative defenses.

This matter is set for trial beginning on April 2, 2007, but the defendants contend that the case can be disposed of without the need for trial. Specifically, on November 15, 2006, the City filed its Motion For Summary Judgment (docket no. 9), asserting that it is not the proper defendant on any of Habben's claims, and the Housing Agency Defendants filed a separate Motion For Summary Judgment (docket no. 10), asserting that Habben cannot generate genuine issues of material fact on essential elements of her claims. On December 11, 2006, Habben filed a Resistance (docket no. 13) to the City's Motion For Summary Judgment, and on December 18, 2006, the City filed a Reply (docket no. 17) in further support of its motion. After an extension of time to do so, Habben also filed a Resistance (docket no. 19) to the Housing Agency Defendants' Motion For Summary Judgment on December 27, 2006, and the Housing Agency Defendants filed a Reply (docket no. 21) in further support of their motion on January 2, 2007. No party requested oral arguments on the motions for summary judgment. Therefore, the defendants' motions for summary judgment are now fully submitted.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. *Fed. R. Civ. P.* 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.*

*R. Civ. P.* 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and

admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment discrimination cases." *See Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994). This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . . ," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases. *Christopher v.*

*Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)). Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent. *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)). The fact remains that "the ultimate burden of persuading the trier of fact that the defendants intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The court will apply these standards to the defendants' Motions for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment

discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

The City and the Housing Agency Defendants have filed separate motions for summary judgment that are, for the most part, premised on entirely separate issues. Nevertheless, the motions are interrelated, as the City recognizes, to the extent that if Habben fails to generate genuine issues of material fact on essential elements of her discrimination claims, in response to the Housing Agency Defendants' Motion For Summary Judgment, then the City is also entitled to summary judgment in its favor, because there is no independent basis for liability of the City on any of Habben's claims. Thus, if the court grants summary judgment in favor of the Housing Agency Defendants on the ground that Habben cannot generate genuine issues of material fact on essential elements of her discrimination claims, then the court need not address the City's separate arguments for summary judgment on the ground that the City is not a proper defendant on any of Habben's claims. Therefore, the court will consider the Housing Agency Defendants' Motion For Summary Judgment first, and will then consider the City's

separate arguments for summary judgment only if the case is not fully disposed of on the Housing Agency Defendants' motion.

### B. The Housing Agency Defendants' Motion For Summary Judgment

The Housing Agency Defendants have moved for summary judgment on all of Habben's claims. Those claims, once again, are claims of race discrimination pursuant to 42 U.S.C. § 1981, Title VII, and the ICRA, and sex or pregnancy discrimination claims pursuant to Title VII and the ICRA. The court will first consider the parties' dispute over individual liability on certain of those claims, then turn to the parties' disputes over whether or not Habben can generate genuine issues of material fact on essential elements of those claims.

#### 1. Individual liability

The individual Housing Agency Defendants, Olson and Nolte, assert that one difference between the state and federal anti-discrimination laws that matters here is the question of individual liability, leading them to move for summary judgment in their favor on the *federal* claims against them. Although it is the last issue raised in the Housing Agency Defendants' Motion For Summary Judgment, the court will consider this issue of individual liability on Habben's *federal* claims first.

##### a. Arguments of the parties

Olson and Nolte assert that claims of individual liability for unfair employment practices are not available to a plaintiff under Title VII or § 1981. Therefore, they assert that Habben's § 1981 and Title VII claims against them in Habben's First, Second, and Third Causes of Action should be dismissed. Habben concedes that supervisors cannot be held individually liable under Title VII, but asserts that the Eighth Circuit Court of Appeals has, nevertheless, acknowledged that individuals can be made parties to such claims, citing

*Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998). She argues that, although only the Agency will ultimately be held liable for the actions of Olson and Nolte, those individuals are properly named parties for the federal claims in this case, so that those claims against them should not be dismissed. Although Olson and Nolte did not put the state-law claims at issue, Habben also argues that the ICRA does allow individual liability for employment discrimination. Olson and Nolte found it unnecessary to reply to Habben's arguments.

### b.    Analysis

The Eighth Circuit Court of Appeals has repeatedly held that supervisory employees, such as Olson and Nolte, cannot be held individually liable under Title VII. *See, e.g., Schoffstall v. Henderson*, 223 F.3d 818, 821 n.2 (8th Cir. 2000); *Bales v. Wal-Mart Stores, Inc.*, 143 F.3d 1103, 1111 (8th Cir. 1998); *Bonomolo-Hagen v. Clay Central-Everly Community Sch. Dist.*, 121 F.3d 446, 447 (8th Cir. 1997); *Spencer v. Ripley County State Bank*, 123 F.3d 690, 691-92 (8th Cir. 1997). The *Bales* decision, upon which Habben relies for the proposition that individual supervisory employees may, nevertheless, be named as defendants in Title VII suits simply does not stand for such a proposition. Instead, in *Bales*, it was not until after the jury verdict on Title VII claims, including a separate damages award against an individual supervisory employee, that the Eighth Circuit Court of Appeals squarely held that supervisors may not be held individually liable under Title VII. *See Bales*, 143 F.3d at 1111 (explaining the procedural footing of the case and citing *Bonomolo-Hagen*, 121 F.3d at 447, as squarely rejecting individual liability under Title VII, in turn citing *Spencer*, 123 F.3d at 691-92, which was handed down three weeks earlier than *Bonomolo-Hagen*). Consequently, the district court decided that, because the individual defendant could only be liable in his capacity as an employee of the institutional defendant, the damages that the jury had already assessed

against the individual defendant were properly imposed upon the "common employer" of the plaintiff and the individual defendant. *Id.* The appellate court concluded that it was neither an error of law nor inequitable for the district court to order the institutional defendant to pay the full amount of the damages that the jury had awarded to the plaintiff, including the portion of the damages that the jury had awarded against the individual defendant. *Id.* In light of the peculiar procedural footing of the *Bales* case when the Eighth Circuit Court of Appeals squarely rejected individual liability on Title VII claims, nothing about the decision in *Bales* suggests that, in an action brought long after the Eighth Circuit Court of Appeals squarely held that a supervisory employee cannot be held individually liable under Title VII, supervisory employees can still be named as defendants on Title VII discrimination claims. Where supervisory employees cannot be individually liable on Title VII claims, there is no basis whatsoever to name them as defendants on such claims. Therefore, the individual defendants here, Olson and Nolte, are entitled to dismissal of the Title VII claims against them in Habben's Second and Third Causes of Action.

The lack of individual liability for discrimination claims under Title VII does not necessarily dispose of the issue of individual liability for discrimination claims under 42 U.S.C. § 1981, as the individual defendants here appear to contend. The individual defendants here have not cited any Eighth Circuit Court of Appeals decision settling the question of individual liability on claims under § 1981 for courts in this Circuit, and this court has found no such decision. On the other hand, other courts have held that supervisory employees can be held individually liable on at least some kinds of race discrimination claims pursuant to § 1981. *See, e.g., Patterson v. County of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004) ("[A]lthough . . . Title VII claims are not cognizable against individuals, individuals may be held liable under §§ 1981 and 1983 for

certain types of discriminatory acts, including those giving rise to a hostile work environment.") (citing cases); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) (an individual defendant can be held liable under § 1981 if the individual defendant was personally involved in the discriminatory conduct), *overruled on other grounds, Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228 (10th Cir. 2000); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988) ("A supervisor can be held personally liable for violations of § 1981 and § 1983 only upon proof that he intentionally discriminated against the plaintiff."). Here, as the basis for her § 1981 claim, Habben has alleged hostile work environment and other kinds of discrimination personally carried out by the individual defendants. Thus, the individual defendants here are not entitled to summary judgment on Habben's § 1981 claim in her first cause of action on the basis that there is no individual liability on such a claim.

It is clear that individual supervisory employees *may* be held liable for discriminatory employment actions under the ICRA, even though Title VII does not authorize such a claim, *see Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), but Olson and Nolte never asserted otherwise in their motion for summary judgment. Thus, Habben's attempts to salvage individual liability on her Fourth Cause of Action, which alleges race and sex/pregnancy discrimination in violation of the ICRA, were unnecessary. That claim will proceed to trial against the individual defendants as well as the institutional defendants, unless it is otherwise found to be deficient as a matter of law.

In short, the individual defendants are entitled to summary judgment on Habben's Title VII claims in her Second and Third Causes of Action, because supervisory employees cannot be held individually liable on Title VII claims, but the individual defendants are not entitled to summary judgment on Habben's § 1981 claim in her First Cause of Action,

simply on the basis of their individual capacities, because supervisory employees *may* be liable on such a claim.

## 2. *Sufficiency of Habben's claims*

The court turns, next, to the question of the sufficiency of Habben's claims of race and sex or pregnancy discrimination in light of the Housing Agency Defendants' motion for summary judgment on those claims. The parties assert, and the court agrees, that discrimination claims pursuant Title VII, § 1981, and the ICRA, all of which are invoked in Habben's Complaint, are determined according to essentially the same standards. *See Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703-04 (8th Cir. 2005) (Title VII and § 1981 cases are analyzed in the same manner); *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA," utilizing "the analytical framework utilized by the federal courts in assessing federal law," although federal law is not controlling). Therefore, the court will consider the Housing Agency Defendants' motion as to each kind of claim in turn, without further differentiating the various state and federal claims.

### a. *Race discrimination*

Habben asserts that she was discriminated against, harassed, and discharged from her employment with the Fort Dodge Housing Agency because of her race and race related activity in violation of 42 U.S.C. § 1981 (First Cause of Action), Title VII (Second Cause of Action), and the ICRA (Fourth Cause of Action). The Housing Agency Defendants assert that Habben cannot generate genuine issues of material fact to permit these claims to go to trial.

### i. *Arguments of the parties*.

The Housing Agency Defendants read Habben's race discrimination claims to be based on allegations that she was discriminated against

because she has biracial children—indeed, the court reads Habben's race discrimination claims the same way, and Habben does not assert otherwise. Although the Housing Agency Defendants assert that the Eighth Circuit Court of Appeals has not definitively recognized such a race discrimination claim, they concede, at least for purposes of their summary judgment motion, that a claim of race discrimination based on having biracial children is cognizable under § 1981 and Title VII. They contend, however, that Habben cannot generate genuine issues of material fact on essential elements of such a claim.[4]

First, the Housing Agency Defendants argue that Habben cannot generate a *prima facie* case of race discrimination, because she was not replaced with a person who was not a member of her protected class. Instead, they argue that the record shows beyond dispute that Habben's duties were reassigned to existing employees. Next, even assuming that Habben's *prima facie* case is adequate, the Housing Agency Defendants argue that the cut in funding from HUD is a legitimate, non-discriminatory reason for Habben's termination. They add that another legitimate, non-discriminatory reason for terminating Habben was concerns over her work performance, arising from persistent errors in her work and her apparent lack of motivation, which they contend was shown by Habben playing computer games when she was not busy instead of helping busier co-workers. Finally, the Housing Agency Defendants contend that Habben has failed to generate any evidence that reasonably suggests that their reasons for terminating her were pretexts for race discrimination. They contend that Habben's assertion that communication with Nolte

---

[4]Although the Housing Agency Defendants do not expressly concede that such a race discrimination claim is cognizable under the ICRA, they do not argue that the claim is not cognizable under the ICRA. Rather, they argue that Habben has failed to generate genuine issues of material fact on a claim of race discrimination under the ICRA for the same reasons that they contend that Habben has failed to generate genuine issues of material fact on her federal race discrimination claims.

deteriorated after Habben told Nolte that she was pregnant is based only on Habben's perceptions. They also argue that Habben had only one discussion with Olson in which she indicated that communication could be better, but that Habben did not assert on that occasion that the problem arose from race discrimination. In addition, the Housing Agency Defendants argue that there is no evidence that Habben's termination had anything to do with her biracial children, because Habben had biracial children when she was hired, she admits that she was not treated poorly when she became pregnant with her third biracial child, she admits that the Agency was flexible about her schedule to allow her to take care of child-related matters, and she admits that there were some concerns about her job performance. Thus, on the present record, the Housing Agency Defendants contend that Habben's termination was fully justified by the funding cuts and her performance issues and that there is nothing that smacks of a race discriminatory animus in any of the actions of the Agency.

In response, Habben argues that she has both "direct" and "circumstantial" evidence of race discrimination. As "direct" evidence, she points, first, to an incident in which her direct supervisor, Rochelle Nolte, used the word "nigger" to describe a group of African-Americans standing on the street outside a public housing unit. Second, Habben points to another incident in which Nolte purportedly spent all day at the local courthouse attempting to find proof that an African-American applicant for Section 8 housing was actually married to the white woman from whom he intended to lease an apartment, despite assurances and proof that the parties were not married. Third, she points to the termination of an African-American woman, Loretha Teggatz, from her position as a Public Housing Manager after complaints by her subordinate that Teggatz was harassing her, with no attempts to discuss the allegations with Teggatz. Finally, Habben points to the termination by the Agency of a youth program run by another African-

American, Penny Grady, and the reallocation of those funds to another local agency with which Olson had a prior relationship.

As "circumstantial" evidence of race discrimination, Habben contends that she was purportedly terminated, in part, for performance problems, but in May 2004, she was given a favorable performance review and awarded the maximum possible merit increase in pay. She contends that she was never reprimanded for the performance issues upon which her termination is now supposedly based. In addition, she contends that she was the only employee with biracial children, that she was the only one terminated as the result of the budget cuts, that she was replaced by a white woman, Angie Wedemeyer, who had white children, and that the Agency added another new employee within a year after her termination. Habben also contends that she can demonstrate that the Agency's reasons for terminating her are pretexts, because the Agency has not been able to show that it actually saved money by terminating her and the Agency implemented only some of the various suggestions that HUD had given the Agency for dealing with HUD's funding cuts.

In reply, the Housing Agency Defendants assert that Habben relies on immaterial statements, hearsay, and speculation, not adequately authenticated evidence, to support her conjectures about any discriminatory reasons for her termination. Responding to specific arguments by Habben, the Housing Agency Defendants contend that the record shows beyond dispute that Habben's position was eliminated, that her duties were covered by reassignment of existing employees, and that the later addition of another employee to the Section 8 Housing Department was funded by a separate funding stream from HUD when the Agency took over responsibility for Section 8 housing in Ames, Iowa, as well as Fort Dodge. Next, the Housing Agency Defendants assert that the savings from Habben's termination were not necessarily realized in the year that the termination occurred, in part, because Habben was fired months after the retroactive date that the funding cuts became

effective, but that it is, nevertheless, undisputed that termination of one full-time position resulted in savings in each subsequent fiscal year. The Housing Agency Defendants also argue that, even if Nolte once used the word "nigger" in early 2000, that incident is isolated and remote from any decision regarding Habben in 2004. They also argue that it is undisputed that Nolte knew that Habben had biracial children throughout her employment and that Habben admits that Nolte was cooperative about conflicts between her work schedule and her children's needs. The Housing Agency Defendants also assert that, contrary to Habben's assertions, the record shows that they implemented all of the suggested cost-savings measures to deal with the cut in funds from HUD, not just the few measures identified by Habben, including Habben's termination. They also point to undisputed evidence that Loretha Teggatz was properly terminated for harassing a co-worker and refusing to follow Olson's directions not to communicate with that co-worker while she was on medical leave. Next, they point out that HUD terminated the funding for every youth program in the United States like the one run by Penny Grady, so that the Agency did not and could not reallocate any funds from the cancelled program to any other program. They also point out that, contrary to Habben's contention that she was the only employee with biracial children, Sauscha Grady also had a biracial child when hired. As their penultimate contention, the Housing Agency Defendants argue that Habben never alleged or even mentioned harassment or discrimination by anyone when she complained to Olson about supposed communication problems with Nolte. Finally, the Housing Agency Defendants argue that, contrary to Habben's assertions, African-American employees were not the only ones terminated by Olson. Rather, three Caucasian employees were also terminated between May 2002 and November 2004, and one of those employees was terminated for making racial comments to a co-worker.

*ii.* ***Habben's "direct" evidence.*** In light of Habben's arguments, the court begins its analysis with the question of whether or not Habben has marshaled any "direct" evidence of race discrimination. As the Eighth Circuit Court of Appeals has explained,

> Direct evidence is evidence that establishes "a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Putman v. Unity Health Sys.,* 348 F.3d 732, 735 (8th Cir. 2003) (quotations omitted) (alteration in original). "'[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" *Browning v. President Riverboat Casino-Missouri, Inc.,* 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse [v. Hopkins],* 490 U.S. [228,] 277, 109 S. Ct. 1775 [(1989) (O'Connor, J., concurring)]).

*Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 934 (8th Cir. 2006). As the court explained, further, even statements by decisionmakers that were "racially offensive and misguided," but not made during the decisional process accompanying the adverse employment action that the plaintiff alleges was discriminatory, do not constitute "direct" evidence of discrimination. *Id.*

The court concludes that Habben has not identified any "direct" evidence of race discrimination. The alleged comment by Nolte, referring to a group of African-Americans standing on the street outside a public housing unit as "niggers," even though purportedly made by someone subsequently involved in the decision to terminate Habben, and clearly "racially offensive and misguided," if the comment was made, was just as clearly not made during the decisional process, almost four years later, to terminate Habben. *Id.* Similarly, the incident in which Nolte purportedly spent a day at the courthouse researching whether an African-American applicant for Section 8 housing was actually married to the white

woman from whom he intended to lease an apartment, the termination of Teggatz, an African-American, some two years before Habben was terminated, and the termination of a youth program run by another African-American had nothing to do with the decisional process to terminate Habben. *Id.* Thus, these incidents and stray comments, if they shed any light at all on the present dispute, are "circumstantial" evidence of a racially discriminatory animus.

*iii.* ***Habben's "circumstantial" evidence***. In the absence of "direct" evidence, Habben's race discrimination claim is subject to the burden-shifting analysis for "circumstantial" evidence cases set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). *Twymon*, 462 F.3d at 934. The first step in that analysis, for an "ordinary" discriminatory discharge claim, requires the plaintiff to establish the following elements of a *prima facie* case: (1) she was a member of a protected class; (2) she was meeting the employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *Id.* Where the plaintiff alleges that discrimination led to her discharge, the last element may be established by showing that the plaintiff was replaced by someone who was not a member of the plaintiff's protected class. *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944-45 (8th Cir. 1994) (proof of replacement by a person outside the protected class will satisfy the fourth element, but is not required, because unlawful discrimination may be inferred in other ways). On the other hand, for a discriminatory discharge claim in the context of a reduction in force (RIF)—which the Housing Agency Defendants contend and Habben concedes is the situation here—the plaintiff was not replaced, so that the fourth element of the plaintiff's *prima facie* case requires evidence, other than replacement of the plaintiff by someone not in the plaintiff's protected class, that gives rise to an inference that race was a factor in the plaintiff's

termination. *See Ahmed v. American Red Cross*, 218 F.3d 932, 933 (8th Cir. 2000) (in a RIF case, because the plaintiff was not replaced, the fourth element of the plaintiff's *prima facie* case requires the plaintiff to demonstrate that there is some additional evidence that race operated in her termination); *Hughes v. Ortho Pharm. Corp.*, 177 F.3d 701, 705 (8th Cir. 1999) (in a RIF case, where the plaintiffs failed to offer additional evidence that race was a factor in their termination, they could not establish a *prima facie* case of race discrimination); *Herrero v. St. Louis University Hosp.*, 109 F.3d 481, 484 (8th Cir. 1997) (same).

The parties contentions for and against summary judgment focus on the fourth element of Habben's *prima facie* case.[5] Even though Habben's claim is not an "ordinary" discriminatory discharge claim, but a claim of a discriminatory discharge in the context of a RIF, the Housing Agency Defendants argue that Habben cannot generate genuine issues of material fact on the fourth element of her *prima facie* case, because she cannot show that she was replaced by someone not in her protected class. In response, Habben asserts that she was, indeed, replaced by someone not in her protected class, Angie Wedemeyer, a white woman with white children, not biracial children. Contrary to Habben's contentions, she was not replaced at all; rather, the record shows beyond dispute that Angie Wedemeyer and other *existing* employees were each reassigned part of Habben's duties, and Habben's position was eliminated. As the Eighth Circuit Court of Appeals has recognized, "In reduction in force cases, it must be expected that some duties will be taken

---

[5]To the extent that the Housing Agency Defendants expressly or impliedly contend that Habben was not meeting her employer's legitimate job expectations, because of purported persistent performance issues, as a challenge to the third element of Habben's *prima facie* case, *see Twymon*, 462 F.3d at 934, a reasonable inference of adequate performance, for purposes of Habben's *prima facie* case, arises from Habben's positive job evaluation and maximum merit raise in May 2004.

on by other employees. Thus, the fact that [non-protected] persons took on some of [the terminated plaintiff's] responsibilities is not sufficient evidence of . . . discrimination." *Stidham v. Minnesota Mining & Mfg., Inc.*, 399 F.3d 935, 939 (8th Cir. 2005) (internal citations eliminated) (addressing a claim of age discrimination in a RIF). Consequently, here, no inference of race discrimination arises from the race of Habben's replacement or any replacement's children, where Habben was not actually replaced, her position was eliminated, and her duties were reassigned to existing employees.

The critical question in this RIF case, for purposes of the fourth element of Habben's *prima facie* case, however, is not who replaced Habben, but whether she can generate genuine issues of material fact, based on evidence other than who replaced her, that race was a factor in her termination. *See Ahmed*, 218 F.3d at 933 (in a RIF case, because the plaintiff was not replaced, the fourth element of the plaintiff's *prima facie* case requires the plaintiff to demonstrate that there is some additional evidence that race operated in her termination); *Hughes*, 177 F.3d at 705 (same); *Herrero*, 109 F.3d at 484 (same). Here, Habben also asserts that other factors in the RIF implementation reveal that her race related activity, having biracial children, was a factor in her termination, including failure of the Agency to implement other cost-cutting measures, inaccuracy of the suggestion that she was not meeting performance standards, which was offered as one of the reasons for selecting her position for elimination, and a higher incidence of termination of African-American employees during the period of her employment. In light of these arguments, the decision of the Eighth Circuit Court of Appeals in *Herrero v. St. Louis University Hosp.*, 109 F.3d 481 (8th Cir. 1997), is particularly instructive.

In *Herrero*, the plaintiff also asserted that factors related to implementation of a RIF revealed that the decision to terminate her was motivated by a discriminatory animus. *Herrero*, 109 F.3d at 484. The court rejected that argument, because the court found that

"uncontradicted evidence confirmed that [the plaintiff] was terminated pursuant to a comprehensive, neutral program motivated by [the defendant's] exercise of business judgment, designed to streamline operations at [the defendant's business]." *Id.* The court noted that the plaintiff did not dispute that the defendant faced budget demands and conceded that a RIF was required; other evidence showed that the defendant instituted a "neutral and systematic approach to termination decisions and that [the plaintiff's] termination was due solely to elimination of her position"; and the plaintiff did not adduce any facts discrediting this evidence. *Id.* The court also rejected the plaintiff's contention that the defendant could have saved money by terminating higher paid employees rather than her, because the courts are not to act as "super-personnel departments" to review the wisdom or fairness of business judgments, except to the extent that those judgments involve intentional discrimination. *Id.* at 485 (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). The court, likewise, rejected the plaintiff's contention that the RIF was an elaborate ruse to get rid of her, where there was no dispute that the RIF was bona fide. *Id.* Finally, the court rejected the plaintiff's contention that the RIF was discriminatory, where all terminated employees were non-white, and all retained employees were white, because the white and non-white employees were not similarly situated, where they were engaged in different jobs. *Id.*[6]

Similarly, in this case, Habben argues that factors related to the implementation of the RIF reveal that the decision to terminate her was motivated by a discriminatory animus, but this court finds that Habben has not generated genuine issues of material fact placing the legitimacy of the implementation of the RIF genuinely in dispute. Rather, as in

---

[6]The plaintiff in *Herrero* apparently did not claim that the employment of whites in certain types of jobs and non-whites in other types of jobs was discriminatory.

*Herrero*, "uncontradicted evidence confirm[s] that [Habben] was terminated pursuant to a comprehensive, neutral program motivated by [the Housing Agency Defendant's] exercise of business judgment, designed to streamline operations at [the Agency]." *Cf. id.*, 109 F.3d at 484.

Somewhat more specifically, as in *Herrero*, Habben does not dispute that the Agency faced budget demands and concedes that a RIF was required; other evidence shows beyond dispute that the defendant instituted a "neutral and systematic approach to termination decisions and that [the plaintiff's] termination was due solely to elimination of her position"; and Habben has not adduced any facts discrediting that evidence. *Id.* It is undisputed that Habben was the second highest paid person in the Section 8 Housing Department after Nolte, who was the director of the department, so that terminating her would result in the greatest overall savings. It is also undisputed that Habben's position was the only one for which all duties could be reassigned to existing personnel without retraining. In light of this evidence, it is not appropriate for the court to act as a "super-personnel department" to review the wisdom or fairness of the Agency's business judgments, where there is no hint that those judgments involved intentional discrimination. *Cf. id.* at 485 (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)). Similarly, even if the record evidence did not establish, beyond dispute, that the Agency undertook all of HUD's suggestions for dealing with the funding cuts, and merely pursued some of those suggestions, as Habben contends—and the record evidence reveals that the Agency did actually follow all of HUD's suggestions—the decision to pursue only some of HUD's suggestions would be a matter squarely within the business judgment of the Agency, and in the complete absence of any inference that the means chosen were racially motivated, the court should not second guess the wisdom of that business judgment. *Id.* Also in this case, as in *Herrero*, there can be no contention that the RIF

was an elaborate ruse to get rid of Habben, where there is no dispute that the RIF was bona fide, in light of the funding cuts by HUD, and Habben's contention that the RIF was discriminatory based on retention of employees without biracial children cannot be sustained, where the retained employees were engaged in different jobs. *Id.* Thus, the court concludes that Habben has failed to generate genuine issues of material fact on the fourth element of her *prima facie* case on her claim of a racially discriminatory termination.[7]

Assuming, for the sake of argument and contrary to the court's conclusion above, that Habben could establish a *prima facie* case of race discrimination, the Agency would then bear the burden to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. *Twymon*, 462 F.3d at 935. The Housing Agency Defendants have met that burden by pointing to evidence establishing beyond dispute that the Agency faced a funding

---

[7]In *Herrero*, the court found beyond dispute that the defendant instituted a "neutral and systematic approach to termination decisions and that [the plaintiff's] termination was due *solely* to elimination of her position." *Id.* at 484 (emphasis added). Here, the Housing Agency Defendants may have "gilded the lily" by asserting that Habben's position was selected for termination, in part, because of Habben's persistent performance problems, when elimination of that position was fully justified by budget cuts and the Agency's conclusion that Habben's position was the only one that involved duties that could be reassigned to existing employees without retraining. Notwithstanding such "lily gilding," the record still establishes, beyond dispute, that Habben's termination was due *solely* to elimination of her position, even if elimination of the position was, in part, based on problems with Habben's performance in that position. To put it another way, the record shows beyond dispute that Habben was *not* terminated *because of* her performance problems, but *because of* elimination of her position. Consequently, even though Habben's positive performance evaluation and maximum merit pay raise in May 2004 are sufficient to generate genuine issues of material fact that Habben's performance was adequate, that evidence is not sufficient to generate genuine issues of material fact that Habben was terminated for any reason other than elimination of her position.

cut from HUD requiring a RIF. *See, e.g., Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (noting that "a RIF certainly constitutes such a [legitimate, non-discriminatory] reason" for a termination).

Thus, again assuming, for the sake of argument and contrary to the court's conclusion above, that Habben could establish a *prima facie* case of race discrimination, in light of the Agency's articulation of a legitimate, non-discriminatory reason for terminating her, Habben must demonstrate by the greater weight of the evidence (and for purposes of summary judgment, must generate genuine issues of material fact) that the Agency's stated reasons are really mere pretexts for discrimination. *Twymon*, 462 F.3d at 935. This Habben has failed to do, for essentially the same reasons that she could not generate any genuine issue of material fact that race was the reason for her termination on the fourth element of her *prima facie* case.

More specifically, "[i]f the employee presents strong evidence of a prima facie case, then such evidence may establish pretext." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006) (FMLA case); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 F.3d 133, 148 (2000) (Title VII case). On the other hand, where the plaintiff's *prima facie* case is not sufficiently strong, the plaintiff must generate a triable issue that she can satisfy her "ultimate burden" to show that her discharge was the result of unlawful discrimination. *See Reeves*, 530 U.S. at 148. For the reasons explained above, Habben's *prima facie* case of race discrimination is *not* strong, so she must present other evidence sufficient to generate a genuine issue of material fact on the "ultimate issue" of discriminatory intent, but she has no such evidence. Indeed, the court finds that this is one of those rare instances, identified hypothetically in *Reeves*, where, even though the plaintiff has, arguably, established a *prima facie* case, no rational factfinder could conclude that her termination was discriminatory, and judgment as a matter of law is appropriate. *Id*. In

*Reeves*, the Supreme Court cited as an example of a case in which judgment as a matter of law (and hence, summary judgment) is appropriate as one in which "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Here, Habben has failed to create *any* genuine issue of material fact that the employer's reason for terminating her was untrue, and there is *also* abundant and uncontroverted independent evidence that no discrimination occurred. *Cf. id.* In these circumstances, the Housing Agency Defendants are entitled to summary judgment on Habben's race discrimination claims based on her termination.

Habben also alleges that she was "harassed," because of her race or race related activity, that is, having biracial children. The Eighth Circuit Court of Appeals has explained the required proof for a harassment claim, as follows:

> To establish a hostile work environment claim, the plaintiff must establish that: (1) he is a member of a protected class; (2) he was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it. *Al- Zubaidy v. TEK Indus., Inc.,* 406 F.3d 1030, 1038 (8th Cir. 2005).
>
> To demonstrate that harassment altered the terms and conditions of one's employment, the conduct alleged must be severe and pervasive, both objectively and subjectively. *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998). When determining whether a work environment is hostile or abusive, we examine all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Al-Zubaidy,* 406 F.3d at 1038.

Harassment standards are demanding. *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 1039 (internal quotations and citations omitted) (holding that the district court properly dismissed plaintiff's hostile work environment claims because "[m]ost of [the manager's] offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race, sex, religion or national origin."). "Mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to support a claim of hostile work environment. *Elmahdi v. Marriott Hotel Servs., Inc.,* 339 F.3d 645, 653 (8th Cir. 2003) (internal quotations, alterations, and citation omitted).

*Arraleh v. County of Ramsey*, 461 F.3d 967, 978-79 (8th Cir. 2006).

Habben cannot generate genuine issues of material fact on the required elements of her racial harassment claim. The only conduct that Habben appears to allege constituted "harassment" was the deterioration in communications with Nolte that Habben asserts occurred when she informed Nolte that she was pregnant with her third biracial child. However, the record is devoid of evidence giving rise to a reasonable inference that any deterioration in communications was "based on a protected characteristic of the plaintiff," that is, having biracial children or being pregnant with a biracial child, as required by the third element of Habben's harassment claim. *See id.* at 978. Rather, only speculation makes any connection between Habben's having biracial children or being pregnant with a biracial child and a supposed deterioration in communications with Nolte.

Moreover, Habben's evidence does not generate genuine issues of material fact on the fourth element of her claim, that "the harassment affected a term, condition, or

privilege of employment," because the deterioration in communications with Nolte was not sufficiently "severe" to alter the terms and conditions of Habben's employment. *See id.* at 979 (defining the required harassment). Certainly, the deterioration in communications was not severe in and of itself and was not physically threatening or humiliating. *Id.* (pertinent factors). Habben tries to generate the necessary inferences by asserting that the breakdown in communications with Nolte was being used by Nolte to "set up" Habben for termination, by making it harder for Habben to do her job according to current requirements, so that she could be accused of errors and poor work performance. Habben also contends that the situation was made more severe, because her complaints about lack of communication were brushed off. The record shows beyond dispute, however, that Habben was never disciplined for performance errors and, instead, received a favorable performance review and the maximum merit pay raise in May 2004, and Habben's termination was justified by a RIF, not by poor performance, so that there is no evidence of the "effect" that Habben contends was intended by Nolte's "set up."

Therefore, the Housing Agency Defendants are entitled to summary judgment on Habben's race discrimination claims pursuant to 42 U.S.C. § 1981 (First Cause of Action), Title VII (Second Cause of Action), and the ICRA (Fourth Cause of Action).

### b. *Sex discrimination*

In addition to her race discrimination claims, Habben alleges that she was discriminated against, harassed, and discharged because of her sex in violation of Title VII of the Civil Rights Act of 1964 (Habben's Third Cause of Action), and the Iowa Civil Rights Act (ICRA) (Habben's Fourth Cause of Action). The Housing Agency Defendants have also moved for summary judgment on Habben's sex discrimination claims.

### i. *Arguments of the parties*. The Housing Agency Defendants assert that they are entitled to summary judgment on Habben's sex discrimination claims for essentially

the same reasons that they contend that they are entitled to summary judgment on Habben's race discrimination claims. They add, however, that the allegations upon which Habben's sex discrimination claims are based cannot be deciphered from her complaint or her testimony. They also add that, in any event, Habben is a female, and during her employment with the Agency, Habben worked in an almost exclusively female workforce. Finally, the Agency argues that Habben was not replaced by a male employee, indeed, she was not replaced at all, and other female employees were reassigned Habben's duties when her position was eliminated. Thus, the Housing Agency Defendants contend that there is simply no evidence to support Habben's sex discrimination claims.

In her response, Habben clarifies that her *federal* "sex discrimination" claim is a "pregnancy discrimination" claim pursuant to the Pregnancy Discrimination Act amendment to Title VII's sex discrimination provisions and apparently asserts that a comparable claim is cognizable under the ICRA. Habben contends that there is "direct" evidence of pregnancy discrimination, because when she complained to Olson about Nolte treating her differently after she learned that Habben was pregnant, Olson told her she was "being hormonal," and failed to follow up with Nolte about the complaint. Habben also contends that the Agency did not adequately train her substitute while she was on pregnancy leave, so that there was a "mess" when she returned for which she was held accountable. As "circumstantial" evidence of pregnancy discrimination, Habben again points to the communication problems she began to have with Nolte after Nolte learned that she was pregnant, Olson's failure to do anything about those complaints, Olson's comment that Habben was just "being hormonal," and the difference in treatment between her complaints and the complaints of a non-pregnant employee about her supervisor, Loretha Teggatz, which resulted in Teggatz's termination. Habben also points to the neglect of her duties while she was on maternity leave and the blame she received for the

resulting "mess" when she returned to work. Finally, Habben contends that she was terminated on the basis of her pregnancy and childbirth, not because of budget cuts at the Agency, because the Agency could not show that it actually saved money by eliminating her position.

The Housing Agency Defendants make no separate reply to Habben's arguments about her sex or pregnancy discrimination claims, although they do challenge Habben's version of various incidents, as they did in reply to Habben's arguments about her race discrimination claims.

*ii.* *Analysis*. Notwithstanding the Housing Agency Defendants' supposed confusion about the basis for Habben's sex discrimination claims, the court finds that those claims are based on Habben's pregnancy. *See* 42 U.S.C. § 2000e(k) (defining "because of sex" and "on the basis of sex" to include, *inter alia*, "because of or on the basis of pregnancy, childbirth, or related medical conditions," and stating, further, that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work"); IOWA CODE § 216.6 (prohibiting pregnancy discrimination); *see also Smidt v. Porter*, 695 N.W.2d 9, 14 (Iowa 2005) (applying the same standards to pregnancy discrimination claims pursuant to Title VII and § 216.6). Thus, Habben has alleged a cognizable basis for her sex discrimination claims.

As with Habben's race discrimination claims, however, the court concludes that Habben has not marshaled any "direct" evidence of sex or pregnancy discrimination. The alleged comment by Olson, responding to Habben's complaints about communication problems with Nolte by telling Habben that she was just "being hormonal," was a comment by someone subsequently involved in the decision to terminate Habben, and was

clearly sexually "offensive and misguided," if it occurred, but it was just as clearly not made during the ultimate decisional process, months later, to terminate Habben's position. *Twymon*, 462 F.3d at 934 (defining "direct" evidence); *See Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006) (defining "direct" evidence for purposes of a pregnancy discrimination claim in the same way such evidence was subsequently defined in *Twymon*, and finding that a comment about the length of an employee's maternity leave was not "direct" evidence of pregnancy discrimination, when the comment was "in the context of a broader management meeting addressing a myriad of . . . issues," and the meeting occurred five months before the plaintiff was terminated). Thus, Olson's stray comment is, if anything, "circumstantial" evidence of sex or pregnancy discrimination.

Moreover, Habben's "circumstantial" case of pregnancy discrimination fares no better than her "circumstantial" case of race discrimination. To survive summary judgment on a pregnancy discrimination claim, the plaintiff must satisfy the requirements of the same *McDonnell Douglas* burden-shifting analysis, defined more fully above in reference to Habben's race discrimination claims. *See Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006); *Schmidt*, 695 N.W.2d at 14.

To establish a *prima facie* case of pregnancy discrimination, the plaintiff must present evidence that demonstrates the following: "'(1) she was a member of a protected group; (2) she was qualified for her position; and (3) she was discharged under circumstances giving rise to an inference of discrimination.'" *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 857 (8th Cir. 1998) (quoting *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574 (8th Cir. 1997), in turn citing, *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)). Habben has not generated a genuine issue of material fact on the third element of this *prima facie* case, because there are simply no circumstances here giving rise to an inference of discrimination. *Id.* (third element). The

only apparent connection between Habben's pregnancy and her termination in the record is the fact that the decision to eliminate her position was made shortly after she returned from maternity leave. The temporal proximity here, which is not very close in this case, where the termination decision was made about six weeks after Habben returned from maternity leave, is not enough, standing alone, to give rise to an inference of discrimination. *See Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 697-98 (8th Cir. 2006) (although a short interval between protected activity and adverse employment action may occasionally raise an inference of causation, "in general, more than a temporal connection is required"). Also, for the same reasons that the court found that the circumstances of Habben's termination, in the context of a RIF, did not give rise to any inference of race discrimination, the court also finds that the circumstances do not give rise to an inference of sex or pregnancy discrimination. Specifically, as to sex or pregnancy related matters, Olson's stray comment about Habben "being hormonal" and Habben's supposition that Nolte was creating communication problems to "set up" Habben for termination after Nolte learned that Habben was pregnant simply do not suggest that elimination of Habben's position in the context of a bona fide RIF was a ruse to discriminate against Habben on the basis of her pregnancy. *See Herrero*, 109 F.3d at 484-85 (the plaintiff had failed to generate inferences of discrimination in the face of a bona fide RIF).

Assuming, for the sake of argument and contrary to the court's conclusion above, that Habben could generate a *prima facie* case of pregnancy discrimination, the court concludes that the Housing Agency Defendants have articulated a legitimate, non-discriminatory reason for Habben's termination, the elimination of her position in a RIF, *see*, *e.g.*, *Wells*, 469 F.3d at 702 (noting that "a RIF certainly constitutes such a [legitimate, non-discriminatory] reason" for a termination), and, further, that Habben has failed to generate any genuine issues of material fact on her "ultimate burden" to show that

the Housing Agency Defendants' proffered reason is a pretext for pregnancy discrimination. *See Quick*, 441 F.3d at 610 (identifying these subsequent steps in the burden-shifting analysis of a pregnancy discrimination claim); *Reeves*, 530 U.S. at 148 (identifying this "ultimate burden" for Title VII cases generally). For essentially the same reasons that Habben could not generate any genuine issue of material fact that her pregnancy was the reason for her termination on the last element of her *prima facie* case, she cannot generate genuine issues of material fact on her "ultimate burden." Here, Habben has failed to create *any* genuine issue of material fact that the employer's reason for terminating her was untrue, and there is *also* abundant and uncontroverted independent evidence that no pregnancy discrimination occurred, in light of undisputed evidence that Habben's termination was the result of a bona fide RIF. *Cf. Reeves*, 530 U.S. at 148 (citing as an example of a case in which judgment as a matter of law (and hence, summary judgment) is appropriate in a case in which "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"); *accord Quick*, 441 F.3d at 610 (although the timing of the plaintiff's termination, the day she returned from maternity leave, "seem[ed] suspicious," the termination followed an investigation of the misconduct incident on which it was based, so that temporal proximity alone was not enough, and other circumstances did not undermine the employer's justification).

Habben's pregnancy harassment claim also fails as a matter of law. It is true that pregnancy-related comments may contribute to a hostile environment. *See Walsh v. National Computer Sys., Inc.*, 332 F.3d 1150, 1160 (8th Cir. 2003) (such comments were sufficient, with other evidence, to support a jury finding of pregnancy harassment discrimination). It is nevertheless true in this case that Olson's "being hormonal" comment, while tactless and offensive, simply was not sufficiently severe to create a

hostile environment, and there is no evidence that such comments were pervasive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (to constitute a hostile environment, harassing conduct must be so severe or pervasive as to alter the terms or conditions of employment). Similarly, for the same reasons that the court found, above, that communication problems with Nolte did not create a racially hostile work environment, the court also finds that those problems did not create a sexually hostile work environment.

Therefore, the Housing Agency Defendants are entitled to summary judgment on Habben's sex or pregnancy discrimination claims pursuant to Title VII of the Civil Rights Act of 1964 (Habben's Third Cause of Action), and the Iowa Civil Rights Act (ICRA) (Habben's Fourth Cause of Action).

### C. The City's Motion For Summary Judgment

Like the Housing Agency Defendants, the City of Fort Dodge has moved for summary judgment on all of Habben's claims. The City asserts numerous arguments for summary judgment in its favor, including failure to name the City in Habben's administrative complaints and failure, otherwise, to exhaust administrative remedies as to the City, Habben's lack of any employment relationship with the City, and the lack of any basis for *respondeat superior* or other basis for liability of the City. The court, however, finds the City's last contention, that it cannot be liable if the Housing Agency Defendants are not liable, is dispositive of the City's motion for summary judgment. Because Habben has failed to generate genuine issues of material fact on essential elements of her claims of race and sex or pregnancy discrimination, there is no basis for liability of the City on those claims, either. Therefore, the City's motion for summary judgment on all of Habben's claims will also be granted.

### III. CONCLUSION

Although the court may not grant summary judgment on the basis of its disbelief of the plaintiff's contentions, *see, e.g., Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005) (the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial), even applying the court's experienced eye to the record in this case, OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881) ("The life of the law has not been logic; it has been experience."), the court has been unable to find any reasonable inference that adverse employment actions toward Habben had anything to do with her having biracial children.

THEREFORE,

1. The City's November 15, 2006, Motion For Summary Judgment (docket no. 9) is **granted** as to all of Habben's claims.

2. The Housing Agency Defendants' November 15, 2006, Motion For Summary Judgment (docket no. 10) is also **granted** as to all of Habben's claims.

3. Judgment in favor of the defendants and against the plaintiff on all claims shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 29th day of January, 2007.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA